IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **EDNA ABEL, et al.** | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | Case No.  3:16-cv-2601 |
| **WILLIS OF COLORADO, INC.,** | § | |
| **WGH HOLDINGS, LTD., and** | § | |
| **WILLIS LTD.** | § | |
| *Defendants.* | § | |

---

## COMPLAINT

---

Plaintiffs, as identified below, file this action complaining of Defendants Willis of Colorado, Inc., WGH Holdings, Ltd., and Willis Ltd., and for cause of action respectfully show as follows:

### INTRODUCTION

1.      This case is one of many that have arisen from the Stanford Financial debacle.[1]  In February 2009, the Securities and Exchange Commission filed suit against Stanford International Bank Ltd. ("SIB"), two of its related companies, and three Stanford executives, alleging a violation of federal securities laws as part of a fraudulent, multi-billion-dollar investment scheme.  Stanford financial assets were frozen, a receiver was appointed, and the resulting implosion of the R. Allen Stanford financial empire culminated in losses to innocent investors and lengthy prison sentences for the culpable Stanford executives.

2.      Plaintiffs are innocent investors who had purchased certificates of deposit (CDs) from Stanford International Bank, Ltd.  For many of these Plaintiffs, their Stanford investments

---

[1] "Stanford Financial" refers to the combined entities related to Stanford International Bank Ltd.

represented significant portions of their life savings.  The Defendants in furtherance of their own financial gain, aided and abetted the sale of Stanford CDs by issuing "safety and security" letters which were used as marketing tools to sell Stanford CDs.  These letters provide assurances to potential purchasers of CDs that, among other things, Stanford Financial had passed stringent risk management review by outside auditors.

## PLAINTIFF PARTIES

3.      The attached Appendix, incorporated by reference as if fully set forth herein, is a list of each of the Plaintiffs in this action.  Each of the named Plaintiffs were owners of SIB CDs at the time Stanford Financial was placed in receivership.[2]  Each of the Plaintiffs purchased SIB CDs during the time period that is relevant to the facts complained of in this lawsuit.[3] Collectively the Plaintiffs hold more than $135 million in Receiver-approved claims.  As detailed below, the Plaintiffs and/or, their financial advisors were all influenced in their decision to purchase SIB CDs by the Defendants' participation in Stanford Financial's fraudulent scheme.

## DEFENDANT PARTIES

4.      Defendant **Willis of Colorado Inc.**, ("Willis Colorado") is a Colorado corporation.  Willis Colorado has engaged in business in the State of Texas, and maintains a designated agent for service of process in Texas.  Willis Colorado may be served through its registered agent for service of process, CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.

---

[2] Or the Plaintiff is the legal successor-in-interest of the original owner of the CD.
[3] Or the Plaintiff is the legal successor-in-interest of the original owner who purchased the CD during the relevant time period.

5.      Defendant **WGH Holdings Ltd**., ("WGH") is a corporation organized under the laws of Bermuda, with its principal place of business in the United Kingdom.  WGH has engaged in business in the State of Texas, but does not maintain a regular place of business or a designated agent for service of process in Texas.  Willis London may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965).  WGH may also be served by serving its registered agent for service of process, Appleby, Cannon's Court, 22 Victoria St., Hamilton, Bermuda.

6.      Defendant **Willis Ltd.** ("Willis London") is a corporation organized under the laws of the United Kingdom, with its principal place of business in the United Kingdom.  Willis London has engaged in business in the State of Texas, but does not maintain a regular place of business or a designated agent for service of process in Texas.  Willis London may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965). Willis London may be served at its home office address in London: 51 Lime Street, London EC3M 7DQ, England.

## JURISDICTION

7.      This court has jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1332(a)(3) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because each Plaintiff is a citizen of a different state than Defendant Willis Colorado, and because Defendants WGH and Willis London are subjects of a foreign state.

8.      This court has personal jurisdiction over each of the Defendants under the Texas Long Arm Statute.

9.      Defendant Willis Colorado has conducted continuous and systematic business in the State of Texas for many years, and it has a registered agent for service of process in the state of Texas.

10.     Defendant WGH has conducted continuous and systematic business in the State of Texas both directly and through its subsidiaries, affiliates and agents, including Willis Colorado and Baranoucky.  WGH has, for at least ten years maintained offices and employees in Austin and Houston.  Through a 2008 merger with U.S. insurance brokerage company Hilb Rogal & Hobbs, WGH acquired offices in Houston, Dallas, San Antonio, Amarillo and McAllen, Texas.

11.     WGH, directly and through its subsidiaries, affiliates and agents, including Willis London, Willis Colorado and Willis employee Amy Baranoucky, engaged in contacts within the state of Texas with Stanford Financial that form the basis of this lawsuit, and which therefore, give rise to specific jurisdiction.  Between at least 2005 and 2009 WGH, directly and through Willis London, Willis Colorado and Amy Baranoucky, served as the insurance broker and risk manager for the Stanford Financial group headquartered in Houston, Texas.  The Defendants performed underwriting services for and on behalf of the entire Stanford Financial group, secured Lloyd's of London insurance policies for Stanford Financial, and authorized and approved the "safety and soundness" letters which are the basis of this lawsuit.  These acts involved multiple trips to Houston by Willis employees and almost daily e-mail and telephone contact between 2005 and 2009.  The Defendants have purposely availed themselves of the privilege of conducting activities within the state of Texas and have established minimum contacts with Texas under the Long Arm Statute.

## FACTS

### Stanford Financial

12.      In 1986, Robert Allen Stanford formed Guardian International Bank on the Caribbean island of Montserrat using funds obtained through his Houston based real estate speculation business.  The bank was subsequently moved to Antigua and renamed Stanford International Bank Limited ("SIB").  During the years that followed, Allen Stanford formed numerous other companies to enhance and support SIB operations.  The term "Stanford Financial" refers to this conglomeration of privately held financial services companies controlled by Allen Stanford.[4]  The core Stanford Financial companies include Antiguan-based Stanford International Bank, Ltd., and Houston-based broker-dealer and investment adviser, Stanford Group Company ("SGC").

13.      SGC began U.S. operations as a broker/dealer in 1995.  SIB and SGC experienced consistent and impressive growth—by 2008, SIB books reflected over $7 billion in customer deposits and SGC had more than $10 billion in assets held in its customers' brokerage accounts. While SGC offered a wide array of brokerage products, including traditional stocks, bonds and mutual funds, SIB offered essentially one product—a certificate of deposit.  SIB paid referral fees to SGC for the sale of CDs, and SGC gave the financial advisors a commission.

14.      Acting through the network of SGC financial advisors, SIB sold billions of dollars in certificates of deposit to investors (which include the Plaintiffs) between 1995 and 2009 by promising safety and security, while at the same time paying very competitive interest rates.

---

[4] Ultimately there were more than 80 operating companies worldwide.  To avoid confusion, the companies will be referred to collectively as "Stanford Financial."  Allen Stanford will be referred to as "Allen Stanford."

While referred to as a "CD," the SIB CD was unlike conventional CDs issued by U.S. banks. The CDs offered and sold by Stanford Financial and SIB constitute "securities" under state and federal securities laws, and were not insured by the FDIC, or guaranteed by any similar government regulatory insurance regime.

15.     Funds received from investors were pooled and purportedly invested in various investments.  The sales literature for the CD touted the product's safety.  Purchasers were told that money from the sale of CDs was allocated in a portfolio that contained equity, fixed income, alternative investments and precious metals.  SIB's annual report generally described the portfolio with some details about the investments, although the exact holdings of the portfolio were not disclosed to investors.  Investors were also told that the portfolio was managed by several European money managers.  Financial advisors were instructed in their training manual, under the heading "SECURITY," that SIB "invests most of its assets in securities such as bonds and equities that are marketable instruments, negotiable in financial markets and easy to liquidate."

16.     The representations that Stanford Financial made regarding the investments backing the CDs were clearly false.  Almost all of SIB's funds were invested in private companies, companies that were traded over-the-counter or in the "pink sheets," real estate, and in a $2 billion dollar loan to Allen Stanford.  Stanford Financial employees, investment advisors and investors were deceived about Stanford's business model, investment strategy, financial strength, and the nature of the investments.

17.     In order to mask the fraud, revenue figures for SIB's assets were "reverse engineered" to arrive at desired levels.  James Davis, Stanford Financial's Chief Financial Officer, oversaw the fabrication of SIB financial statements.  After it was determined what level

of revenue SIB needed in order to provide glowing reports to investors, Davis would back into that amount by assigning fictitious revenue amounts to each category of income.  Laura Pendergest-Holt, Chief Investment Officer, Gil Lopez and Mark Kuhrt, both accountants, and Allen Stanford, Chief Executive Officer, were all implicated in the fraud.  Davis and Hold pled guilty to federal charges, while Lopez, Kuhrt and Allen Stanford were found guilty following trial, and sentenced to lengthy prison terms.

18.     A fraud of this scale required a significant sales force to place the CDs with an unwitting public.  The CDs were sold worldwide by SGC financial advisors, many of whom had successful careers with reputable investment firms and significant books of business before being recruited by Stanford Financial.  During the criminal trials, federal prosecutors made it clear that hundreds of Stanford employees had been deceived about the true nature of SGC, SIB and the program to sell CDs.  Stanford Financial provided its salespeople with extensive training materials and systematically fed them false financial information regarding the soundness of Stanford Financial and the safety and security of the CDs.  Allen Stanford and his co-conspirators intended that this information would be used by its sales force to sell CDs.  It was used, and was very effective.

19.     An important factor in SIB's enormous capability to market its CDs was a carefully crafted false image of success, safety and security.  In order to craft this image, Stanford Financial purchased insurance policies from Willis, and then obtained safety and security letters, also known as "comfort" letters, from Willis to market the CDs.  Willis's comfort letters intentionally created the false perception that SIB carried multiple insurance policies designed to ensure that investments in SIB CDs were as safe and secure as investments in CDs issued by banks insured by the FDIC.  They also claimed that Stanford Financial had

undergone a stringent risk management review when, in fact, it had not.  The letters were delivered to unwitting SGC financial advisors to use as marketing tools.  Willis knowingly participated in creating this false perception, and this illusion induced the Plaintiff investors to buy SIB CDs.

20.     In February, 2009 the United States Securities Exchange Commission (SEC) raided SGC and SIB, and quickly confirmed that SIB had nothing resembling $7 billion in safe, liquid investments.  Purchasers of Stanford Financial CDs lost their entire investments, and financial advisors and other employees suffered permanent injury to their careers and reputations.  On February 6, 2009, the SEC filed suit against SIB and related entities alleging fraud in connection with the issuance of certificates of deposit.  This led to the Court freezing the assets of Stanford Financial and appointing a receiver to manage and distribute the assets of Stanford Financial.  The SEC issued statements alleging that Stanford Financial operated as a "massive Ponzi scheme," misappropriated billions of dollars of investors' money, and that "Stanford International Bank's financial statements, including its investment income, are fictional."  What in 2009 began as an allegation that the chief executives of Stanford Financial used the companies to operate an enormous fraud, has been today, transformed from allegation, to common understanding, to undisputed fact. [5]

## WILLIS' PARTICIPATION IN THE FRAUDULENT SCHEME

21.     In July 2004, the Stanford Financial Insurance Committee engaged Willis[6] to provide financial lines insurance coverage.  Stanford Financial was familiar with Willis because

---

[5] *See, e.g., Janvey v. Golf Channel, Inc.*, 2015 U.S. App. LEXIS 11268, *4 (5th Cir. Tex. June 30, 2015) where the Court states, "The facts are undisputed.  For nearly two decades, Allen Stanford operated a multi-billion dollar Ponzi scheme through more than 130 affiliated entities centered around Stanford International Bank Limited."
[6] "Willis" refers to the Defendant Willis Group Holdings, Ltd. and its subsidiaries, including the defendants Willis

Willis had been providing insurance coverage for Stanford's Caribbean Airlines—Caribbean Sun and Caribbean Star—since at least 2002.

22.     Beginning in 2004, Stanford Financial purchased and used insurance policies secured by the Willis as marketing tools to sell the SIB CDs.  Stanford Financial paid millions of dollars in annual premiums, not because the insurance was necessary, but because it assisted sales production by reassuring the Plaintiffs that purchasing SIB CDs was a safe and secure investment.  Stanford Financial determined that private insurance coverage on SIB could be used to create the illusion that the SIB CDs were insured when in fact they were not.  Stanford Financial did this by using misleading statements regarding insurance in its marketing materials. Stanford Financial enlisted the help of its insurance broker, Willis Colorado, to participate in the fraudulent marketing scheme.  Willis Colorado agreed to participate in a fraudulent and misleading insurance letter distribution campaign that was designed to assist Stanford Financial in marketing CDs to unwitting investors.

23.     No other third party had as much knowledge of Stanford Financial's worldwide operations as Willis, precisely because it was its job, as the insurance and risk manager, to have a thorough understanding of Stanford Financial's operations.  As a result of the provision of these professional insurance services, Willis was regularly listed in Stanford Annual Reports as the Stanford Financial group's "Insurance and Risk Manager."  In serving in such professional capacity, Willis engaged in regular and systematic contacts with Stanford Financial personnel in Houston, Texas.

24.     In December 2004, Barbara Fortin, the head of Stanford Financial's insurance program, recommended to the Stanford Insurance Committee that Willis representatives travel to

of Colorado, Inc. and Willis Ltd.  Willis Group Holdings, Ltd. is the publicly traded parent company of these Defendant subsidiaries.

Antigua to have a better understanding of Stanford Financial's business needs in order to develop an overall insurance plan for Stanford Financial.  As a result, in late January or early February 2005, representatives of Willis London, including Doug Ogilvie, Patrick Caine, and Duncan Holmes, and Amy Baranoucky, traveled to Antigua to personally view some of Stanford Financial's ongoing real estate development projects.

      25.     On July 8, 2005, Willis London sent Fortin in Houston, Willis' draft Underwriting Information Presentation for Stanford's real estate development projects in Antigua.  As part of its underwriting for the Stanford Financial development projects, Willis London received detailed information from Stanford Financial, including details concerning the scope and nature of the various real estate development projects and the anticipated amounts of money Stanford Financial planned to invest in the projects.  Thus, Willis was privy to inside information regarding Stanford Financial and its business operations.

      26.     Since Willis London was familiar with Stanford Financial's overall business operations, its business model, products, customer base, and its promotional materials and disclosures to its investors which touted liquidity above all else, Willis London knew that Stanford Financial was essentially using the investors' money to run a real estate development fund, and that Stanford Financial's investments in Antiguan and other real estate projects were not being disclosed to investors.

      27.     Each year, beginning in August 2005 and ending on October 2008, Willis provided Stanford Financial with insurance endorsement "comfort letters," on Willis letterhead. These letters described alleged insurance policies covering SIB, touted SIB's credentials and otherwise endorsed SIB.  The letters were purportedly prepared by Willis, but in fact the text of the letters had been prepared by Stanford Financial for its own marketing purposes, and provided

to Willis to put on Willis letterhead.  Willis would then print the letters on its letterhead and Amy Baranoucky, a Willis executive, would sign them.  Baranoucky sent hundreds of signed comfort letters to Stanford Financial in Texas.  A blank space was left where the inside address would go, and Stanford Financial would fill in the addressee, and use them to market the CDs.

28.     The letters were clearly designed and intended by the Defendants to be distributed to prospective SIB investors, as they contain untruths and omissions directed at investors with the purpose of promoting SIB and selling CDs.  The Defendants had no reasonable basis to make the statements contained in the letters because they knew, or should have known, that SIB did not undergo "stringent" annual Risk Management reviews, and that any reviews were not conducted by an outside audit firm, but rather were conducted by "one man" audit shop in Antigua that was dominated by Allen Stanford and Stanford Financial.

29.     The letters stated, "We are the insurance broker for Stanford International Bank and find them to be first class business people."  Then they identify insurance policies such as "Directors and Officers Liability Insurance with Lloyds of London" and "Bankers Blanket Bond with Lloyds of London."  Willis goes on to state, "In order to qualify for the above coverages, the Bank [SIB] underwent a stringent Risk Management Review conducted by an outside audit firm.  We have found that all our dealings with the Bank have been conducted in a professional and satisfactory manner."

30.     Willis had actual knowledge that the letters would be used by Stanford Financial for marketing purposes—to retain existing investors or obtain prospective investors for SIB. Willis lent credibility to Stanford Financial by putting its internationally respected brand name behind Stanford Financial to support CD sales.  Willis and Stanford Financial falsely led financial advisors and investors to believe that the endorsement letters represented genuine

independent endorsement of Stanford Financial by Willis and that a "stringent Risk Management Review" had been conducted when it had not been.

31.     In fact, the only "risk management" audit conducted on SIB by any third party was a limited scope review performed only once, in 2003, by a one-person operation in Florida called "Stogniew & Associates" that resulted in a superficial report full of disclaimers, including the following:

> The risk survey was not conducted for the purpose of expressing an opinion on Stanford's financial statements, internal control, risk management systems or operating procedures, and was limited to obtaining information pertinent to the underwriting of insurance policies purchased by Stanford.

Furthermore, the cover letter of the Risk Survey states that Stogniew "did not independently test the effectiveness of the internal controls, risk management systems, or the accuracy of the financial reports."  Nevertheless, from 2004 through 2008 Willis continued to represent that Stanford Financial had undergone "stringent Risk Management Review," even though no review had been conducted while Willis was assisting Stanford Financial with its marketing efforts.  On information and belief, Baranoucky, on behalf of Willis, never even saw the Stogniew & Associates report, but instead, signed the letters, knowing the text was written by someone at Stanford, without having verified the content.

32.     SIB's 2007 Annual Report stated it had over $6.3 billion in "financial Assets at Fair Value," of which over $5.6 billion were capable of liquidation on demand.  This was a patently false statement.  Nevertheless, Willis, by publicly advertising that it was Stanford's risk manager, and stating that a "stringent Risk Management Review" had been done, implied that they had supported, reviewed, and validated the risks, including liquidity risk, as stated in SIB's annual report.

33.     Furthermore, it was clear to Willis that the intent of the letters was to create the misleading impression that, if necessary, proceeds from the insurance policies referenced in the letter would inure to the benefit of investors.  In the context of these letters, there is no conceivable reason that Willis and Stanford Financial would supply financial advisors and investors with information about run-of-the-mill insurance policies that provided no benefit to investors.

34.     In creating these letters and placing them into the stream of commerce with full knowledge of their intended use, Defendants actively and materially aided Stanford Financial in perpetrating its fraudulent scheme.  The letters constitute fraud by omission because they intentionally omit material facts, including the scope of coverage of the referenced insurance policies, and the fact that Defendants had "no idea" one way or the other when, or even whether, the alleged "Risk Management reviews" were conducted, or whether they were "stringent" by any definition.  Moreover, to the extent that the letters refer to an "outside audit firm" performing the reviews, the letters omit to mention that the reviews were conducted by a one man accounting firm in Antigua that had strong and long lasting personal connections to Allen Stanford.

35.     Stanford Financial initiated a strategic plan to lure top financial advisors away from their employers with competitive recruiting packages.  Dozens of reputable financial advisors with spotless records took their clients and their careers to Stanford from prestigious firms.

36.     The comfort letters were shown to financial advisors to help instill confidence in them about the reputation and quality of SIB, and were used in wooing them to leave their existing firms and join Stanford Financial.  The letters were also included by Stanford Financial

as part of the training given to financial advisors, and the financial advisors were trained on using the letters to market and sell CDs to new investors. The letters were used during SGC Managing Director meetings as well as in-office training of financial advisors. The insurance letters were intended to, and did provide, outside verification to financial advisors that the SIB CDs were a secure investment to offer to their clients. These comfort letters were relied upon by financial advisors as they touted the safety of the CDs to their clients. Thus, Willis' assistance in marketing the CDs by providing comfort letters to financial advisors influenced investors to buy, hold and reinvest in SIB CDs. The financial advisors were not in a position to know that the letters contained false and misleading information, and thus they too were the victims of the Defendants' and Alan Stanford and his co-conspirator's fraudulent scheme.

37.     The false and misleading information generated by Willis spread quickly throughout the Stanford Financial operation, causing more and more investors to invest and reinvest in CDs.

38.     The facts giving rise to the Stanford Financial fraud are complex and were not readily ascertained for more than a year after the SEC shut down Stanford operations. Little or none of the information necessary to prepare a complaint against Willis and other responsible parties was available to the Plaintiffs until well after the receivership was instituted. This Court has ruled that even the Court-appointed receiver could not have known of the facts giving rise to various legal actions at the beginning of the receivership.

39.     On July 2, 2009 a putative class action styled *Troice et al. v. Willis of Colorado et al.*, No. 3:09-cv-01274 was timely filed in the United States District Court for the Northern District of Texas. The Plaintiffs herein were putative class members in *Troice v. Willis of*

*Colorado* who are opting out of the class to pursue this lawsuit.  Pursuant to the *American Pipe*[7]

doctrine, the statute of limitations has been tolled for the plaintiffs during the pendency of the

*Troice* class action, and this lawsuit is timely filed.


## CAUSES OF ACTION and THEORIES OF VICARIOUS LIABILITY

### FRAUD AND PARTICIPATION IN A FRAUDULENT SCHEME

40.     The "safety and soundness letters" letters issued by Willis on behalf of Stanford

Financial convey false information, contain material misrepresentations, and omit material facts

regarding Stanford Financial.

41.     Each Plaintiff invested in the Stanford Financial charade by purchasing SIB CDs.

Over the years that Plaintiffs purchased and maintained SIB investments, Plaintiffs were

repeatedly told, either directly by Stanford Financial representatives or via Stanford Financial

promotional materials, that, among other things:  (i) an investment in SIB was safer than

investing in U.S. banks because SIB did not make loans but instead invested in safe and highly

liquid instruments; (ii) SIB and Stanford Financial were U.S.-based businesses regulated by the

U.S. Government; and (iii) that an investment in SIB was completely safe and secure because it

was guaranteed and insured by Lloyd's, was audited by an "outside" audit firm and subjected to

regular, "stringent" risk management examinations.  All of this was false.

42.     Likewise, Stanford Financial sales representatives and promotional materials

repeatedly omitted to inform Plaintiffs that, among other things:  (i) SIB was not regulated by the

U.S. Government;  (ii) Plaintiffs' investments in SIB were not insured; (iii) SIB was operating

illegally as an unregistered investment company soliciting and selling unregistered securities by,

---

[7] *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny, e.g., *Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345, 350 (1983).

from and through Houston, Texas;  (iv) that SIB was not invested in safe secure and liquid instruments; and (v) that SIB was audited by a one man audit shop under the control of Allen Stanford and SIB, was not subjected to stringent risk management examinations.

43.     Willis knew these misrepresentations were false or that they were made recklessly as a positive assertion without knowledge of their truth.  Willis knew that the omissions created a false and misleading impressions regarding material facts.    Willis knew and intended, or had reasonable expectations that these misrepresentations and omissions would be transmitted by Stanford Financial to its registered representatives, and that this information would be used by such representatives to induce the Plaintiffs to purchase Stanford CDs.  Willis's misrepresentations and omissions were a proximate and direct cause of Plaintiffs' injuries.

44.     By their conduct described herein, Willis aided and abetted and participated with Stanford Financial and SIB in a fraudulent scheme.  In particular, Willis made the conscious decision to participate in the scheme by joining the Stanford Financial sales force to market, promote and advertise SIB to prospective clients in order to assist and enable Stanford Financial to continue to sell SIB CDs based on the misrepresentations that investments in SIB were insured and secure when in fact they were not.  Willis signed the letters knowing that the statements made therein were false.  Nevertheless, they allowed said letters to be distributed to Stanford Financial clients with full knowledge that the letters were being used to generate more investments in Stanford Financial.  Willis's participation in the fraudulent scheme is a proximate cause of actual damages to Plaintiffs.

## NEGLIGENT MISREPRESENTATION

45.     As more fully stated above, Willis made misrepresentations in the "safety and soundness" letters which they issued to vouch for the integrity of Stanford Financial.  These

letters were created by Willis at the behest of Stanford Financial for the purpose of furthering Willis's business interests with Stanford Financial. The letters contained false information and gave false impressions regarding the integrity of Stanford Financial, and Willis failed to exercise reasonable care in obtaining and communicating the information. This information was supplied for the purpose of giving guidance to Stanford representatives who in turn used this information to give guidance to Stanford investors, such as the Plaintiffs, and the Plaintiffs relied on this information to their injury.

**NEGLIGENCE**

46.     Willis owed the Plaintiffs a duty of care as an insurance broker and risk manager to exercise reasonable care to ensure that the "safety and soundness" letters sent to Plaintiffs and their financial advisors provided an accurate and proper description of the type and amounts of insurance coverages available to Stanford Financial for the protection of the Plaintiffs. Once Willis made representations to financial advisors and investors it had a duty to be accurate and truthful. Moreover, Willis owed the financial advisors, as insureds, a duty to be truthful in its representations. Willis owed a duty of care to ensure that Stanford Financial indeed underwent a stringent risk management review. Willis breached these duties by misrepresenting the description of insurance policies in place, and by failing to conduct a risk management review or ensure that a stringent risk management review had been conducted. Willis's breach of this duty was a proximate cause of injury to the Plaintiffs. Furthermore, the wrongful acts of Willis, when viewed objectively from Willis's perspective at the time the acts occurred, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to the Plaintiffs and others. Willis was subjectively aware of the risks involved, but proceeded with conscious

indifference to their duties and to the rights and welfare of Plaintiffs.  As a result, Plaintiffs seek exemplary damages for Willis's gross negligence.

## TEXAS SECURITIES ACT 33(F)—AIDING AND ABETTING

### PRIMARY LIABILITY

47.     SIB and Stanford Financial offered to sell, and sold unregistered securities to the Plaintiffs.  SIB and Stanford Financial offered to sell, and sold securities to the Plaintiffs, but was not registered as a securities dealer.  SIB and Stanford Financial offered to sell, and sold securities by means of untrue statements of material fact and by omissions to state material facts. Each of these acts by SIB and Stanford Financial constitute a violation of the Texas Securities Act § 33(A)(1), and § 33(A)(2).

48.     The CDs offered and sold by Stanford Financial and SIB constitute "securities" under the relevant securities law jurisprudence.  SIB and Stanford Financial never registered the CDs with the Texas State Securities Board and therefore they were sold to Plaintiffs as unregistered securities in violation of Article 581 of the Texas Securities Act.  The sale of the CDs constituted an integrated offering under Texas securities laws, on information and belief, was a public offering and not a private offering exempt from registration because:

    a.  The integrated offering involved general solicitation. This general solicitation by Stanford Financial through SGC and its U.S. affiliates, agents and brokers, as well by the foreign financial advisors, included general public advertisements, publicly distributed magazine articles and other communications and media published in print in Houston, Texas and distributed broadly for general distribution in the United States and abroad to offerees and purchasers of the CDs.

    b.  The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Texas and Florida, of Stanford Financial's products, including the CDs.

c.  The integrated offering involved seminars and meetings conducted in Texas and Florida and in Latin America.  The integrated offering was conducted through the use of sales seminars, "road shows," and meetings directed at potential offerees and purchasers.

d.  The integrated offering involved offers to thousands of offerees and purchases by thousands of offerees involving sums of money far in excess of that disclosed to the SEC in SIB's Form D filing with the SEC. The integrated offering involved offers to, and purchases by, at least thousands of Texas and Florida residents or those otherwise subject to Texas or Florida law, as well as offers and sales to Mexican and Venezuelan residents in the Texas and Florida offices of Stanford Financial.

e.  The aggregate size of the sales of CDs during this period was approximately $7.2 billion.  The aggregate size of the sales in Texas from this period was at least several hundred millions of dollars. The aggregate size of the sales in Florida from this period was at least several hundred millions of dollars.

f.  The offering was made to investors with whom Stanford Financial/SGC had no pre-existing relationship.

g.  The offering was made to persons who did not qualify as "accredited United States investors"; and far more than 35 persons who did not qualify as "accredited United States investors" purchased the CDs.

49.     SIB offered to sell, and sold securities to the Plaintiffs, but was not registered as a securities dealer.  Stanford Financial was selling CDs from, by and through the State of Texas to investors and then pooling its customers' money together to make illiquid, speculative investments.  Stanford Financial made these sales without registering with the Texas State Securities Board as a dealer under Section 12(A).

50.     Stanford Financial was operated as a Ponzi scheme that was perpetuated by the continued sales of SIB CDs to unsuspecting investors like Plaintiffs.  Stanford Financial led Plaintiffs, directly and indirectly, verbally and through written marketing materials prepared and disseminated via Stanford Financial's Houston office (including Defendants "safety and soundness" letters), to believe that their money was being invested in safe, liquid investments that were insured.  These statements were material misstatements because the money was not

invested in safe, liquid and fully insured investments, but rather was pooled together with other investors' money, and used to finance Stanford Financial principals' lifestyles, and to invest in long term, illiquid and high risk investments including real estate development projects in Antigua and elsewhere in the Caribbean.  Moreover, Stanford Financial omitted to inform Plaintiffs that it was selling them unregistered securities and that it was operating as an unregistered, uninsured, illegal Caribbean real estate development investment company fund in violation of the Investment Company Act and the Texas Securities Act.

MATERIALLY AIDED BY DEFENDANTS

51.     Pursuant to the Texas Securities Act § 33(F)(2), Defendants are liable for materially aiding Stanford Financial and SIB in (i) offering and selling unregistered securities to the Plaintiffs, (ii) offering and selling securities without being a registered securities dealer, and (iii) offering and selling securities by means of untrue statements of material fact and by omissions to state material facts.

52.     In particular, by their actions described herein, Defendants provided substantial assistance to SIB and Stanford Financial in the marketing and sales process and materially aided Stanford Financial and SIB, an unregistered dealer, to sell unregistered securities to Plaintiffs from, by and through the State of Texas.  Defendants actively joined with the Stanford Financial sales force and therefore knew or should have known that they were acting as links in the chain of selling unregistered securities to Plaintiffs.

53.     Defendants had general awareness that they were assisting an offshore, unregistered investment company to sell unregistered securities from, by and through Texas. Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct in blindly signing letters attesting to the safety and soundness of SIB with full

knowledge that the purpose of the letters was to lure more investors to invest in SIB. In assisting an offshore bank to sell securities through a Houston-based investment company enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality. As a result of Defendants' conduct in materially aiding Stanford Financial and SIB to sell unregistered securities from, by and through Texas, Plaintiffs have lost their investments, and Defendants' violations are a proximate cause of actual damages to Plaintiffs.

54.     As more fully detailed above, Defendants materially aided SIB and Stanford Financial in offering and selling securities by means of untrue statements of material fact and by omissions to state material facts.

55.     Defendants showed reckless disregard for the truth or the law in their rendering assistance to Stanford Financial in deceiving SIB investors. Defendants were aware of Stanford Financial's deceptive practices in general, and specifically they were aware that Stanford Financial used the deceptive safety and soundness letters to market the securities to investors.

56.     This conduct of Defendants is a violation of Texas Securities Act § 33(F)(2), and Willis is liable to the same extent that Stanford Financial would be liable as a seller of securities.

### TEXAS INSURANCE CODE VIOLATIONS

57.     Defendants were engaged in the business of insurance in the state of Texas, and have disseminated information relating to insurance coverage within the State of Texas.

58.     As shown by the facts above regarding Defendants' issuance of the "safety and soundness" letters on behalf of Stanford Financial, Defendants made or caused to be made statements which misrepresented the terms of the insurance policies identified in the letters, misrepresented the benefits or advantages promised by such insurance policies, and used names or titles for the policies that misrepresented their true nature. Defendants failed to state material

facts that were necessary to make the statements made in the "safety and soundness" letters not misleading, considering the circumstances under which the statements were made.  Such statements were made in a manner that would mislead a reasonably prudent person to a false conclusion of material fact.

59.     These acts constitute a violation of Texas Insurance Code § 541.051, 541.052 and 541.061.  By definition, a violation of these sections of the Texas Insurance Code also constitute a violation of § 17.46 of the Texas Business and Commerce Code, (Deceptive Trade Practices Act) and Plaintiffs seek all the rights and remedies conferred by both the Insurance Code and the Deceptive Trade Practices Act.

60.     These deceptive acts and practices were a proximate and producing cause of actual damages to the Plaintiffs, and Defendants committed these acts knowingly as they had actual awareness of the falsity, unfairness, or deceptiveness of statements in the safety and soundness letters.

## CONSPIRACY

61.     Defendants conspired with each other and with Allen Stanford, SIB, Stanford Financial, SGC, and others to commit the wrongful conduct described herein, including fraud and violations of the Texas Securities Act.

62.     Together with Allen Stanford, SIB, Stanford Financial, SGC, and others, the Defendants conceived, participated in, and implemented a common enterprise to use insurance as a marketing tool to sell SIB CDs for the pecuniary benefit of Stanford Financial and, thereby, Defendants.  The object of the conspiracy was to market and promote Stanford Financial and SIB and thus assist them in selling SIB CDs to the Plaintiffs using untruths and omissions of material facts as stated herein.  There was a meeting of the minds between all Defendants and Allen Stanford, SIB, Stanford Financial, SGC, and others as to the object to be accomplished, being the sale of SIB CDs.

The Defendants took overt acts designed to assist Stanford Financial to accomplish the goal of selling CDs in and through the State of Texas.  One of those acts was Defendants' agreement with Stanford Financial that Baranoucky would sign the letters at issue in this case on Willis's own letterhead with full knowledge that (1) the text of the letters had been prepared by Stanford Financial and (2) that the contents of the letter were misleading and omitted material facts.  Defendants conspiracy with Stanford Financial to violate the Texas Securities Act is a proximate cause of Plaintiffs' injuries.

**ALTER EGO**

63.     Baranoucky is the Willis executive who signed the safety and soundness letters that are the subject of this lawsuit.  In sending these letters she was operating under the direction of Defendant WGH Holdings ("WGH").  WGH is the publicly traded parent company of Willis of Colorado and Willis Ltd.

64.     WGH operates through a "Group Executive Committee" which directs and oversees all of its subsidiaries, including Willis Colorado and Willis Ltd.  For example, the subsidiaries have a unified payroll system, and all the employees in North America are paid by the same WGH subsidiary no matter which subsidiary technically employs them.  WGH executive officers dominate Willis Ltd. and Willis Colorado through control of their respective boards of directors.  In 2005-2007, years in which Willis Colorado issued the insurance letters in dispute, the board of directors of Willis Colorado was comprised exclusively of two WGH executives.

65.     WGH reports its financial condition on a consolidated basis with its subsidiaries, which is defiled collectively as the "Company," and it is virtually impossible to distinguish

between revenue generated from one subsidiary and from another subsidiary.  Furthermore, WGH and its subsidiaries are promoted as a single global company, "Willis."

66.    The defendant subsidiaries of WGH are operated as mere tools, or the alter egos of WGH, and it would be unjust to allow WGH to escape liability for the actions of these subsidiaries.

## AGENCY

67.    Defendants acted at all times as the agents of Stanford Financial and SIB.  In agreeing to sign the "safety and soundness" letters as Stanford Financial's insurance brokers, Defendants agreed to serve as Stanford Financial's agents in the marketing process for the sales of the SIB CDs.  In preparing the text of the "safety and soundness" letters, Stanford Financial authorized Defendants to act for them.  As such, Stanford Financial had the right to control both the means and the details of Defendants' actions with respect to the "safety and soundness" letters.  Defendants acted as the agents of Stanford Financial and SIB in creating and circulating the letters with the sole objective of promoting and selling Stanford Financial and SIB and their products.

68.    Furthermore Defendant Willis Colorado and Baranoucky acted at all times as the agent(s) of Willis London and WGH in dealing with Stanford Financial, including with respect to their general and specific jurisdictional contacts with the State of Texas, under the theories of actual, apparent and agency by estoppel.  Defendant Willis London, in turn, acted at all times as the agent(s) of WGH, including with respect to their general and specific jurisdictional contacts with the State of Texas, under the theories of actual, apparent and agency by estoppel.  Willis London acts as the general agent of WGH and effectuates and carries out all of WGH's business.  Moreover, WGH has purposefully created the appearance of authority that Willis Colorado and

Baranoucky act on behalf of WGH by allowing Willis Colorado (as well as its other subsidiary companies) and Baranoucky to prominently display the WGH brand, international trademark or tradename and logo on all of their correspondence.  WGH controls the manner in which its subsidiaries, such as Willis Colorado, are perceived by the public and therefore intentionally creates the impression in the minds of third parties that Willis is one unified, global entity that acts as a single unit.  Indeed WGH's own website touts its "Global" approach to client service, in which WGH "combines" its global resources to offer the "full benefit of every service that Willis offers" worldwide.  As an employee of this global, cohesive and consolidated single business joint enterprise, Baranoucky also acted as a direct agent of WGH with regard to the allegations made herein.

## RESPONDEAT SUPERIOR

69.     Willis is liable for the tortious acts of its employee Amy S. Baranoucky, and she was acting within the course and scope of her employment with Willis, and in furtherance of its businesses, when Defendants engaged in the wrongful conduct described herein.  Thus, Baranoucky's conduct described herein is attributable to Willis through the doctrine of respondeat superior.

## DAMAGES

70.     As a direct and proximate result of Defendants' actions, the Plaintiffs have suffered significant injury.  They have lost the value of their investments in SIB CDs, and are entitled to a return of their principal which is in excess of $135 million.  Plaintiffs are also entitled to be compensated for the loss of use of their funds.

71.     In addition, the wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of § 41.003, Tex. Civ. Prac. &

Rem. Code.  Plaintiffs are entitled to recover punitive damages in an amount necessary to punish Willis and to deter similar conduct of others in the future.

## CONDITIONS PRECEDENT

72.      All conditions precedent to Plaintiff's right to recover as requested herein have occurred or been satisfied.

## JURY DEMAND

73.      Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38.

## PRAYER

WHEREFORE, Plaintiffs request that Defendants be cited to appear and answer and, on final trial, that Plaintiffs have judgment against Defendants for the following:

a.      Actual economic damages;
b.      Exemplary damages as allowed by law;
c.      Costs and attorney fees;
d.      Pre-judgment and post-judgment interest as allowed by law; and
e.      All other relief in law or in equity to which Plaintiffs may show themselves justly entitled.


Respectfully submitted,



/s/      *Michael J. Stanley*

Michael J. Stanley ▪ TBN 19046600
mstanley@stanleylaw.com
W. Shawn Staples ▪ TBN 00788457
wsstaples@stanleylaw.com
STANLEY FRANK & ROSE
7026 Old Katy Rd., Suite 259
Houston, Texas 77024
Tel: 713-980-4381 ▪ Fax: 713-980-1179

**ATTORNEYS IN CHARGE FOR PLAINTIFFS**

# APPENDIX
# TO PLAINTIFFS' COMPLAINT

This Appendix is incorporated into Plaintiffs' Complaint, and identifies each of the Plaintiffs in this action.

Each of the Plaintiffs identified below were owners of SIB CDs at the time Stanford Financial was placed in receivership (or is the legal successor-in-interest of the original owner of the CD). Each of the Plaintiffs purchased SIB CDs during the time period that is relevant to the facts complained of in this lawsuit (or is the legal successor-in-interest of the original owner who purchased the CD during the relevant time period):

1.      Edna Abel is an individual residing in Baton Rouge, Louisiana.

2.      Robert C. Ahders is an individual residing in Carmichael, California and is the beneficiary of the Robert C. Ahders, IRA.

3.      Rodrigo Rivera Alcayaga, individually and as trustee of the Tochas Trust.  Mr. Alcayaga resides in Mexico City, Mexico.

4.      David and Carlie Arntsen are married individuals residing in Houston, Texas.

5.      Dr. Charles E. Baker is an individual residing in Bryan, Texas and is the beneficiary of the of the Charles E. Baker IRA.

6.      Robert Lewis Bambauer is an individual residing in Charlotte, North Carolina.

7.      Anne H. Barrett is an individual residing in Houston, Texas.

8.      Lawrence D. Bartell is an individual residing in Houston, Texas.

9.      Kyle J. Bauer is an individual residing in Humble, Texas.

10.      Thomas and Camilla Bauersfeld are married individuals residing in The Woodlands, Texas.

11.     Randy C. Bellelo is an individual residing in Maringouin, Louisiana.

12.     David J. Belock, Jr. is an individual residing in Grand Rapids, Michigan and is the beneficiary of the David J. Belock, Jr. IRA.

13.     Sheri Berger is an individual residing in New York, New York.

14.     Russell R. Bergeron is an individual residing in Prairieville, Louisiana and is the beneficiary of the Russell R. Bergeron IRA.

15.     Stanley J. Bertman is an individual residing in Baton Rouge, Louisiana.

16.     Scott M. Boeker is an individual residing in Willis, Texas.

17.     Daniel J. Bonfiglio is an individual residing in Baton Rouge, Louisiana and is the beneficiary of the Daniel J. Bonfiglio IRA.

18.     Angela K. Bonfiglio is an individual residing in Baton Rouge, Louisiana and is the beneficiary of the Angela Kim Bonfiglio IRA.

19.     John C. Bonfiglio is an individual residing in Baton Rouge, Louisiana.

20.     Bradley Davis is the director of Boundless Insurance Co, LTD., a Cayman Islands Company.

21.     Beverly Braud is an individual residing in Baton Rouge, Louisiana.

22.     Ernesto A. Brizuela is an individual residing in Hallandale Beach, Florida.

23.     Marcus Bromley, individually and as trustee of the S. Meghan Trust u/w/o Fred G. Burk, Esther Bromley Burk UAD, Marcus Bromley Trustee.  Mr. Bromley resides in Atlanta, Georgia.

24.     Jon Michael and Nancy Bryant are married individuals residing in Daufuskie Island, South Carolina.

25.     Kenneth and Shara Bubes are married individuals residing in Willmington,

Delaware.  Mr. Bubes is the beneficiary of the Kenneth Bubes IRA.

26.     Charles and Rhonda L. Buck are married individuals residing in Cypress, Texas.  Ms. Buck is the beneficiary of the Rhonda L. Buck IRA.

27.     James R. Calvin, MD is an individual residing in Baton Rouge, Louisiana.

28.     Richard Malouf is the president of the Camellia Family Partnership.  Camellia Family Partnership is a partnership organized under the laws of the state of Texas.

29.     Ralph V. and Lee Caplan are married individuals residing in Baton Rouge, Louisiana.  Mrs. Caplan is the beneficiary of the Lee Leonie Caplan IRA.  Mr. Caplan is the beneficiary of the Ralph V. Caplan IRA.

30.     Carol E. Cappello is an individual residing in Cape Coral, Florida.  Ms. Cappello is the beneficiary the Carol E. Cappello IRA.

31.     Allen R. and Diane F. Caradine are married individuals residing in Willis, Texas.

32.     Diana Smith is a partner of the D. Smith Family Limited Partnership, a limited partnership organized under the laws of the state of Texas.

33.     Donald Carey, individually and as Trustee of the Eileen R. Carey Irrevocable Living Trust.  Mr. Carey is the beneficiary of the Donald E. Carey IRA and resides in Baton Rouge, LA.

34.     John L. and Patricia A. Carey are married individuals residing in Willcox, Arizona.  Mr. Carey is the Beneficiary of the John L. Carey IRA.

35.     Thomas P. Carroll is an individual residing in Roswell, Georgia and is the beneficiary of the Thomas P. Carroll IRA.

36.     Alene M. Casemore is an individual residing in Baton Rouge, Louisiana.

37.     Rosine Chappell is an individual residing in Houston, Texas.

38.     Danette Sue Chimenti is an individual residing in Austin, Texas.

39.     Joann A. Clabby is an individual residing in Marietta, Georgia and is the beneficiary of the Joann A. Clabby IRA.

40.     Garland M. Cohlmia is an individual residing in Dallas, Texas and is the beneficiary of the Garland M. Cohlmia IRA.

41.     Keith C. Cook is an individual residing in Denham Springs, Louisiana and is the beneficiary of the C. Keith Cook IRA.

42.     William T. and Mary Alice Cook are married individuals residing in Houston, Texas.

43.     Corwin Randall Courtney or Tammy Jean Courtney are married individuals residing Houston, Texas

44.     Linda G. Cowart is an individual residing in Roswell, Georgia.

45.     Albert L. Cox is an individual residing in Baton Rouge, Louisiana.

46.     Susan Trimble Crane is an individual residing in Richmond, Texas.

47.     Ruben J. Cruz is an individual residing in Atlanta, Georgia.

48.     Kimberly Stewart is attorney in fact for of Barbara Pichnie Culotta an individual residing in Serriday, Louisiana.

49.     Robert S. Culvern is an individual residing in Madison, Georgia and is the beneficiary of the Robert S. Culvern IRA.

50.     Jerome J. and Delia M. Cwiok are married individuals residing in Palm Harbor, Florida.

51.     Calvin Darden is an individual residing in Roswell, Georgia.

52.     Charles Stephen and Joyce Dark are married individuals residing in Marietta,

Georgia.  Mr. Dark is the beneficiary of the Charles Stephen Dark IRA.

53.     Charley Davidson is an individual residing in Houston, Texas.  Mr. Davidson is the beneficiary of the Charley Davidson IRA.

54.     Stephen and Mary Davis are married individuals residing in Midway, Utah.

55.     Gerrit S. and Rhonda D. Dawson are married individuals residing in Baton Rouge, Louisiana.

56.     Steven R. and Kathleen Day are married individuals residing in Nokomis, Florida.

57.     Emma Bray Deavours is an individual residing in Duluth, Georgia.

58.     Frances G. (Cromers) Deavours is an individual residing in Duluth, Georgia.

59.     Jason Deavours is an individual residing in Duluth, Georgia.

60.     John DeChaud is an individual residing in Gunter, Texas.  Mr. DeChaud is the beneficiary the John DeChaud IRA.

61.     Edward L. and Nancy L. Diefenthal are married individuals residing in Metairie, Louisiana.

62.     Gennaro or Elsa DiMeo are married individuals residing in Canyon Lake, Texas.

63.     Albert J. DiVagno, Jr is an individual residing in Gainesville, GA.  Mr.   DiVagno is the beneficiary of the Albert J. DiVagno, Jr. IRA.

64.     William H. and Anna Marie Downing are married individuals residing in Houston, Texas.

65.     James G. Dubos, individually and as trustee of the James Gillen Dubos Revocable Trust.  Mr. Dubos resides in Baton Rouge, Louisiana.

66.     Richard D. and Nanciann Eames are married individuals residing in Bullard, Texas.  Mrs. Eames is the beneficiary of the Nanciann Eames IRA.  Mr. Eames is the beneficiary of the

Richard D. Eames IRA.

67.     Karen S. Egedy is an individual residing in Baton Rouge, Louisiana.

68.     James Escort is an individual residing in Baton Rouge, Louisiana.

69.     Rick B. Ferguson is an individual residing in Little Rock, Arkansas.

70.     Rose and John Fife are married individuals residing in Baton Rouge, Louisiana.

71.     Edward Fiori is an individual residing in Richmond, Texas.

72.     Kimberly Fleming is the representative of the Estate of Barbara Fleming, deceased, and resides in Baton Rouge, Louisiana.

73.     Michael C. Fleming is an individual residing in Atlanta, Georgia.  Mr. Fleming is the beneficiary of the Michael C. Fleming IRA.

74.     Josette M. Fleszar is an individual residing in Gainesville, Georgia.  Ms. Fleszar is the beneficiary of the Josette M. Fleszar IRA.

75.     Jamey R. Folland is an individual residing in St. Petersburg, Florida.  Ms. Folland is the beneficiary of the Jamey R. Folland IRA.

76.     Stanley Fountain is an individual residing in Acworth, Georgia.  Mr. Fountain is the beneficiary of the Stanley R. Fountain IRA.

77.     Jorgina Franzheim is an individual residing in La Jolla, California.

78.     Richard Henry and Harriet L. Friedman are married individuals residing in Houston, Texas.

79.     William J. Garrity III and Janet M. Garrity are married individuals residing in Bluffton, South Carolina.

80.     Dr. Richard Garza MD is an individual residing in Monterey, California.  Dr. Garza is the beneficiary of the Richard Garza M.D. IRA.

81.     Kenneth D. and Linda L Gaspard are married individuals residing in Baton Rouge, Louisiana.  Mr. Gaspard is the beneficiary of the Kenneth D. Gaspard IRA.   Ms. Gaspard is the beneficiary of the Linda L. Gaspard IRA.

82.     Debra S. Gibbs is an individual residing in Shenendoah, Texas.  Ms. Gibbs is the beneficiary of the Debra S. Gibbs IRA.

83.     James J. Gillespie is an individual residing in Grayson, Georgia.  Mr. Gillespie is the beneficiary of the James J. Gillespie IRA

84.     Ellen P. Gilmore is an individual residing in Baton Rouge, Louisiana.

85.     Gail Giorgio, individually and as trustee of the Gail B. Giorgio Trust (Rev) UAD 05 17 91 Gail B. Giorgio Trustee.  Ms. Giorgio resides in Gainsville, Georgia.

86.     Betty Gosda is an individual residing in Houston, Texas. Ms. Gosda is the beneficiary of the Jerome F. Gosda IRA.

87.     Carolyn R. Gould is an individual residing in Wilmington, Massachusetts and is the beneficiary of the Carolyn R. Gould IRA.

88.     Bart and Shawnda Greer are married individuals residing in Lubbock, Texas.

89.     George Greisinger, individually and as trustee of The George W. Greisinger Revocable Living Trust.  Mr. Greisinger resides in Bumpass, Virginia.

90.     Barbara Griffin is an individual residing in Baton Rouge, Louisiana.

91.     Richard Lee and Jacquelyn Groesbeck are married individuals residing in Blacksburg, Virginia.

92.     Suzanne Haggard is an individual residing in Metairie, Louisiana.  Ms. Haggard is the beneficiary of the C. Suzanne Haggard IRA.

93.     James S. and Beth L. Hake are married individuals residing in Cumming, Georgia.

Mr. Hake is the beneficiary of the James S. Hake IRA.

94.     John A. Harrill Jr., individually and as trustee of the Upstate Carolina Radiology PA Retirement Plan FBO John A. Harrill.  Mr. Harrill resides in Spartanburg, South Carolina.

95.     James Stanley Harris is an individual residing in Covington, Louisiana.

96.     George and Diane Hart are married individuals residing in Ponte Verde, Florida. George Hart is the beneficiary of the George Hart SEP IRA.

97.     Reno and Linda Hartfiel are married individuals residing in Kingwood, Texas.

98.     Susan C. Heim is an individual residing in Houston, Texas.

99.     Gerald T. and Dorothy E. Hennings are married individuals residing in Baton Rouge, Louisiana.  Mr. Hennings is the beneficiary of the Gerald T. Hennings IRA.

100.    Juan Manuel Hernaiz, individually and as trustee of the Vasco Trust.  Mr. Hernaiz resides in Mexico.

101.    Patricia Herr is an individual residing in Miami, Florida.

102.    Robert G. Higgins is an individual residing in Marietta, Georgia.  Mr. Higgins is the beneficiary of the Robert G. Higgins IRA.

103.    Rose Mareyna Hinz is an individual residing in Sugar Land, Texas.

104.    John Hobgood is an individual residing in Clinton, Louisiana.  Mr. Hobgood is the Executor of the Estate of Lorene Hobgood, Deceased.  Mr. Hobgood inherited the proceeds of the CD's owned by Ms. Hobgood.

105.    Robert and Georgia Ann Holt are married individuals residing in Otis, Louisiana.

106.    Debbie W. Hughey is an individual residing Carrollton, Texas.  Ms. Hughey is the beneficiary of the Debbie W. Hughey SEP IRA.

107.    William Huse, individually and as Trustee of the William Huse Charitable

Remainder Trust.  Mr. Huse is also the Trustee of the William H. Huse Revocable Trust and the 2C9 Foundation.  Mr. Huse resides in Peachtree City, Georgia.

108.    Gordon Jaehne is the attorney-in-fact for Doris A. Jaehne who resides in Houston, Texas.  Ms. Jaehne is the beneficiary of the Henry A. Jaehne IRA.

109.    Plas T. James is an individual residing in Atlanta, Georgia.  Mr. James is the beneficiary of the Plas T. James SEP IRA.

110.    Brian and Lisa M. Janz are married individuals residing in Germantown, Tennessee.  Ms. Janz is the beneficiary of the Lisa M. Janz IRA.

111.    Jacqueline F. Jenkins is an individual residing in Atlanta, Georgia.

112.    Morris L. and Molly R. Jenkins are married individuals residing in Breyard, North Carolina.  Morris L. Jenkins is the beneficiary of the Morris L. Jenkins SEP IRA.

113.    Max is Jensen is an individual residing in Kingwood, Texas.

114.    Anne Rush is the attorney-in-fact for Theresa Joffrion who resides in Lake Charles, Louisiana.

115.    Jacob P. and Lanette P. Johnson are married individuals residing in Houston, Texas.

116.    Robert L. Johnston is an individual residing in Duluth, Georgia.

117.    Paul A. Jones is an individual residing in Jasper, Georgia.  Mr. Jones is the beneficiary of the Paul A. Jones IRA.

118.    Portia L. Jones is an individual residing in Dickinson, Texas.  Ms. Jones is the beneficiary of the Portia L. Jones IRA.

119.    Mary Jordan is an individual residing in Vancouver, Canada.

120.    William E. and Carol Junell are married individuals residing in Houston, Texas.

121.    Lorena Karpen is a partner in the Karpen 1994 Family L.P. is a limited partnership

organized under the laws of the state of Texas.

122.    Paul M. and Ruth M. Kelly are the trustees of the Paul M. and Ruth M. Kelly Revocable Trust.  Mr. and Mrs. Kelly reside in Blairsville, Georgia.

123.    Micheal Kepesky is an individual residing in Little Rock, Arkansas.  Mr. Kepesky is the beneficiary of the Michael Kepesky IRA.

124.    William and Susan B. Kessler are married individuals residing in Kennesaw, Georgia.  Mr. Kessler is the beneficiary of the William Kessler IRA.  Mrs. Kessler is the beneficiary of the Susan B. Kessler IRA.

125.    Mark W. Kidd is an individual residing in Houston, Texas.

126.    Todd S. Klumok and Lisa Klumok are married individuals residing in Atlanta, Georgia.

127.    George Koshy and Aleyamma George Koshy are married individuals residing in League City, Texas.  Aleyamma George Koshy is the beneficiary of the Aleyamma George IRA.

128.    Joseph L. Krause Jr. is an individual residing in Willcox, Arizona.

129.    Shirley Ladd, individually and as trustee of the Shirley Ladd Trust.  Ms. Ladd resides in Boca Raton, Florida.

130.    Louis L. LaFontisee III is an individual residing in Miami, Florida.

131.    Jesse Lamberth is an individual residing in Sawyerville, Alabama.  Mr.  Lamberth is the beneficiary of the Jesse R. Lamberth IRA.

132.    Byron S. and Linda L. Landry are married individuals residing in Loranger, Louisiana.

133.    Isaac Ward Lang III is the representative of the Estate of I. Ward Lang, deceased, and Marian Lang, deceased, who resided in Johns Creek, Georgia.

134.    Linda G. Lanoux is an individual residing in Prairieville, Louisiana.

135.    Alton B. and Cynthia Ann Laskowski are married individuals residing in Spring, Texas.

136.    Martin Paul Lassoff and Kathryn Ellen Urbanek are individuals residing in Houston, Texas.

137.    Grace Chen LeBlanc is an individual residing in Baton Rouge, Louisiana.

138.    Patrick and Sandra LeBlanc are married individuals residing in Lafayette, Louisiana.

139.    Ronald E. Lee, individually and as trustee of the Ronald Lee Trust resides in Houston, Texas.  Mr. Lee is the beneficiary of the Ronald E. Lee, IRA.

140.    Ann Lestarjette is the representative of the Estate of Larry Greene Lestarjette, deceased, who resides in Baytown, Texas.  Larry Greene Lestarjette was the beneficiary of the Larry Lestarjette IRA.

141.    Michelle Levet is an individual residing in France.

142.    Sherrill M. Lineberger is an individual residing in Ocean Isle Beach, North Carolina.

143.    Patricia Lorie is an individual residing in Coral Gables, Florida.

144.    Yolanda Lorie is an individual residing in De Leon Springs, Florida.

145.    Kim Vince is the president of Louis Mechanical Contractors, Inc., a corporation organized under the laws of the state of Louisiana.

146.    Thomas J. Low is an individual residing in New Orleans, Louisiana.  Mr. Low is the beneficiary of the Thomas J. Low IRA.

147.    Jerry D. Lund is an individual residing in Pleasant View, Utah.  Mr. Lund is the

beneficiary of the Jerry D. Lund IRA

148.    Malvern Lusky is the president Lusky Investment Partnership, LP, a limited partnership organized under the laws of the state of Texas.

149.    Geoffrey M. and Andrea Lee Lyman are married individuals residing in Atlanta, Georgia.  Ms. Lyman is the beneficiary of the Andrea Lee Lyman IRA.

Dr. Brian Chimenti is the president of M Tag Ventures, L.P., is a limited partnership organized under the laws of the state of Texas.

150.    Lawrence M. Martin is president of MACO Investments, LLC., a limited liability company organized under the laws of the state of Louisiana.

151.    Jeff Chimenti is the president of MSM Ventures, L.P., a limited partnership organized under the laws of the state of Texas.

152.    John M. Maddox is an individual residing in Atlanta, Georgia.  Mr. Maddox is the beneficiary of the John M. Maddox IRA.

153.    Robert Maher and Ann Maher married individuals residing in Plano, Texas.

154.    Ammaji Malineni and Sayi Prasad Malineni are married individuals residing in Baton Rouge, Louisiana.

155.    Vasavi Malineni is an individual residing in Houston, Texas.

156.    William A. and Jean G. Mancuso are married individuals residing in Lake Charles, Louisiana.  Jean G. Mancuso is the beneficiary of the Jean G. Mancuso IRA.

157.    Norris A. Marchand is an individual residing in Greenwell Springs, Lousiana.

158.    Marilyn A. Martin is an individual residing in Brentwood, Tennessee.

159.    Manuel L. and Natalie Martinez are married individuals residing in Baton Rouge, Louisiana.

160.    Gregory Martinoia is an individual residing in France.

161.    Robert Matejek is an individual residing in Dallas, Texas.

162.    Debra Sledge is the attorney-in-fact for Carroll S. Mayer, Jr., who resides in Baton Rouge, Louisiana.

163.    Martha A. McDonald is an individual residing in Winston Salem, North Carolina. Ms. McDonald is the beneficiary of the Martha A. McDonald IRA.

164.    Dolores McLaughlin is an individual residing in Marietta, Georgia. Ms. McLaughlin is the beneficiary of the Dolores McLaughlin IRA.

165.    Ernest D. and Joan Mercer are married individuals residing in Longview, Texas. Mr. Mercer is the Beneficiary of the Earnest D. Mercer IRA.

166.    Keith Ellis and Janet Merkley are married individuals residing in Doha, Qatar.

167.    Jennifer Miller is an individual residing in Sarasota, Florida.

168.    Fred H. Mills, Jr. and Deborah Mills are married individuals residing in St. Martinville, Louisiana. Deborah Mills is the beneficiary of the Deborah Mills IRA. Fred Mills Jr. is the beneficiary of the Fred Mills, Jr. IRA.

169.    Fred Mills is the President of Henry J. Mills Company, Inc., a corporation organized under the laws of the state of Louisiana.

170.    Fred Mills is the President of Mills Cashway Pharmacy, Inc., a corporation organized under the laws of the state of Louisiana.

171.    Martha M. Minish is an individual residing in Statesville, North Carolina. Ms. Minish is the beneficiary of the Martha M. Minish IRA.

172.    Calvin D. Mitchell, Jr. is an individual residing in Charlotte, North Carolina. Mr. Mitchell is the beneficiary of the Calvin D. Mitchell, Jr. IRA.

173.   Billy E. Moak is an individual residing in Zachary, Louisiana.  Mr. Moak is the beneficiary of the Billy E. Moak IRA.

174.   Juan Pablo Molano is an individual residing in Miami, Florida.

175.   John and Betty Montague are married individuals residing in Houston, Texas.

176.   Timothy R. and Sandra E. Moore are partners in the Timothy R. and Sandra E. Moore Family, LP, a limited partnership organized under the laws of the state of Texas.  Mr. Moore is the beneficiary of the Timothy R. Moore IRA.

177.   Rolando H. and Hannelore Mora are married individuals residing in Houston, Texas.  Mrs. Mora is the beneficiary of the Hannelore Mora IRA.  Mr. Mora is the beneficiary of the Rolando H. Mora IRA.

178.   Maurice S. Moragne is an individual residing in Mooresville, North Carolina.  Mr. Moragne is the beneficiary of the Maurice S. Moragne IRA.

179.   Frank H. and Cynthia D. Morgan are married individuals residing in Hot Springs Village, Arizona.  Mrs. Morgan is the Beneficiary of the Cynthia D. Morgan IRA.  Mr. Morgan is the beneficiary of the Frank H. Morgan IRA.

180.   Thomas Newland is an individual residing in Lafayette, Louisiana.

181.   Danny R. Myers is an individual residing in Zachary, Louisiana.  Mr. Myers is the beneficiary of the Danny R. Myers IRA.

182.   Mark Najarian is an individual residing in Irving, Texas.

183.   Marc and Lisa Nekhom are married individuals residing in Fort Worth, Texas.  Mr. Nekhom is the beneficiary of the Mark Nekhom IRA.

184.   David N. or Pamela J. Nelson are married individuals residing in Bellville, Texas.

185.   Barbara Offerman is an individual residing in San Francisco, California.

186.    William and Jennifer Ohrt are married individuals residing in Houston, Texas.

187.    Pedro Ruenes, individually and as trustee of the Oxford Trust.  Mr. Ruenes resides in Torreon, Coahuila, Mexico.

188.    John R. and Pamela C. Packer are married individuals residing in Atlanta, Georgia.  Mr. Packer is the beneficiary of the John R. Packer IRA.

189.    Don M. and Marilyn Parkinson are married individuals residing in Cumming, Georgia.  Mr. Parkinson is the beneficiary of the Don M. Parkinson IRA.

190.    Kenneth D. Parks is an individual residing in Atlanta, Georgia.

191.    Doug Shaw is the trustee of the Patricia Shaw Trust.  Ms. Shaw resides in Akron, Ohio.

192.    Steven W. Payette is an individual residing in Kingwood, Texas.  Mr. Payette is the beneficiary of the Steven W. Payette IRA.

193.    Hannah K. Peck Finley, individually and as trustee of the Peck Family Trust UAD.  Ms. Finley resides in Maui, Hawaii.

194.    Barry and Rebecca Philips are married individuals residing in Baton Rouge, Louisiana.  Barry Philips is also the trustee of the Molly Christine Phillips Trust.

195.    Charlotte L. Pippin is an individual residing in Atlanta, Georgia.

196.    William Pippin III is an individual residing in Atlanta, Georgia.

197.    Paulette Porcaro is an individual residing in New York, New York.

198.    Thomas Clark Pritchard is an individual residing in Houston, Texas.

199.    Harry Pure is an individual residing in Norristown, Pennsylvania.  Mr. Pure is the beneficiary of the Harry Pure, IRA.

200.    James Shaw is the president of Quaint Properties, LTD, a Cayman Islands

Company.

201.    Daniel L. Quinter is an individual residing in Johns Creek, Georgia.

202.    Gurdarshan K. Rai is an individual residing in Houston, Texas.

203.    Adriana Ramos is an individual residing in Austin, Texas.  Ms. Ramos is the successor of Elwood, S.A. Trust.

204.    Marilyn H. Rangel is an individual residing in DeRidder, Louisiana.  Ms. Rangel is the beneficiary of the Marilyn H. Rangel IRA

205.    Byron A. and Evelyn Ann Ratliff are married individuals residing in Franklin, Tennessee.    Mr. Ratliff is the beneficiary of the Byron A. Ratliff IRA.

206.    Dennis C. Redding is an individual residing in Asheville, North Carolina.  Mr. Redding is the beneficiary of the Dennis C. Redding IRA.

207.    Frank E. and Susan S. Rinaldo are married individuals residing in Denver, North Carolina.  Mr. Rinaldo is the beneficiary of the Frank E. Rinaldo, Jr. IRA.  Ms. Rinaldo is the beneficiary of the Susan S. Rinaldo SEP IRA.

208.    Kerry Rinehart is an individual residing in Pasadena, Texas.

209.    Karen Lynn Robbins is an individual residing in Baton Rouge, Louisiana.

210.    James E. and Rose Rohde are married individuals residing in Fayetteville, Texas. Mr. Rohde is the beneficiary of the James E. Rohde IRA.

211.    Rene J. and Martha A. Saenz are married individuals residing in Houston, Texas. Mr. Saenz is the beneficiary of the Rene J. Saenz IRA.  Ms. Saenz is the beneficiary of the Martha A. Saenz IRA.

212.    Joseph C. Schneider, Jr., is an individual residing in Atlanta, Georgia.

213.    Thomas H. and Lynn L. Schneider are married individuals residing in Overland

Park, Kansas.

214.     Robert L. and Janice Scholie are married individuals residing in Hancock, Missouri. Janice E. Scholie is the trustee of the Janice E. Scholie Intervivos Trust.  Robert L. Scholie is the trustee of the Robert L. Scholie Intervivos Trust.

215.     Thomas G. Schultz is an individual residing in Houston, Texas.

216.     Linda R. Seager is an individual residing in South Jordan, Utah.  Ms. Seager is the beneficiary of the Linda R. Seager IRA

217.     Julius J. Sedtal Jr. and Sherry A. Sedtal are married individuals residing in Moscow, Texas.  Mr. Sedtal is the beneficiary of the Julius J. Sedtal, Jr. IRA.   Mrs. Sedtal is the beneficiary of the Sherry A. Sedtal IRA.

218.     Bela Sen is an individual residing in Baton Rouge, Louisiana.  Ms. Sen is the beneficiary of the Bela Sen IRA.

219.     Dennis R. Schaffer is an individual residing in Houston, Texas.  Mr. Schaffer is the beneficiary of the Dennis R. Shaffer SEP IRA.

220.     Norma Shaw is an individual residing in Akron, Ohio.

221.     Robert Scott Shean and Valerie Shean are individuals residing in Baton Rouge, Louisiana.  Robert Scott Shean is the beneficiary of the Scott Shean, IRA.

222.     Suzanne T. Shean is an individual residing in Carriere, Mississippi.  She is also the Executrix of the Estate of Michael C. Shean, deceased.      Ms. Shean is the beneficiary of the Suzanne T. Shean IRA.

223.     Gregory M. Shelton is an individual residing in Atlanta, Oregon.  Mr. Shelton is the beneficiary of the Gregory M. Shelton IRA.

224.     Robert D. Shingler, individually and as trustee of the Elizabeth D. Shingler Trust.

Mr. Shingler resides in Klamath Falls, Oregon.  Mr. Shingler is the beneficiary of the Robert D. Shingler IRA.

225.    Michael R. Short is an individual residing in Houston, Texas.  Mr. Short is the beneficiary of the Michael R. Short IRA.

226.    Harold D. and Paula C. Siegel are married individuals residing in Baton Rouge, Louisiana.

227.    Hinwig Lee is the president of Silver Lake Risk Services, Inc., a corporation organized under the laws of the state of Utah.

228.    Larry S. Simeral and Virginia H. Simeral are married individuals residing in Baton Rouge, Louisiana.

229.    Mark T. Simon is an individual residing in Talmo, Georgia.  Mr. Simon is the beneficiary of the Mark T. Simon IRA.

230.    Guy Wayne and Debra M. Sledge are married individuals residing in Baton Rouge, Louisiana.

231.    Richard Shannon Smith is the Representative of the Estate of Richard Lane Smith, deceased, and resides in Baton Rouge, Louisiana.

232.    Wanda Smith is an individual residing in Georgetown, Texas.  Ms. Smith is the beneficiary of the Wanda Smith IRA.

233.    Bruce Smitherman is an individual residing in Milton, Georgia.  Mr. Smitherman is the beneficiary of the Bruce Smitherman SEP IRA.

234.    Saul and Adrienne Solomon are individuals residing in Houston, Texas.

235.    Iakovos Spetsiotakis is an individual residing in Houston, Texas.

236.    Michael L. Spurlock is an individual residing in Franklin, Tennessee.  Mr. Spurlock

is the beneficiary of the Michael L. Spurlock IRA.

237.    Franklin H. Stansel is an individual residing in Round Rock, Texas.  Mr. Stansel is the beneficiary of the Franklin H. Stansel IRA.

238.    Mary Cote Stegen is an individual residing in Marietta, Georgia.

239.    Janet A. Steinway is an individual residing in East Point, Georgia.  Ms. Steinway is the beneficiary of the Janet A. Steinway IRA.

240.    Thomas W. and Mary C. Stoll are married individuals residing in Bradenton, Florida.  Mr. Stoll is the beneficiary of the Thomas Stoll IRA.  Mrs. Stoll is the beneficiary of the Mary Stoll IRA.

241.    Charles and Donna M. Sydney are married individuals residing in Stone Mountain, Georgia.

242.    Barbara Tassin is an individual residing in Baton Rouge, Louisiana.

243.    Dorothy F. Taylor is an individual residing in Baton Rouge, Louisiana.  Ms. Taylor is the beneficiary of the Dorothy F. Taylor IRA.

244.    Robert and Patricia Taylor are married individuals residing in Germantown, Tennessee.

245.    William P. Tedeschi is an individual residing in Atlanta, Georgia.  Mr. Tedeschi is the beneficiary of the William P. Tedeschi IRA.

246.    Gerald J. Thomas is an individual residing in Kingwood, Texas.  Mr. Thomas is the beneficiary of Gerald J. Thomas IRA.

247.    Terence R. Thompson, Jr. is an individual residing in Bryant, Arkansas.  Mr. Thompson is the beneficiary of the Terence R. Thompson, Jr. IRA.

248.    James J. and Maureen E. Trucksess are married individuals residing in Ft. Meyer,

Florida.  Mr. Trucksess is the beneficiary of the James J. Trucksess IRA.

249.    Michael H. Turner is an individual residing in Loganville, Georgia.  Mr. Turner is the beneficiary of the Michael H. Turner IRA.

250.    Thomas E. Van Autreve is an individual residing in Kennesaw, Georgia.  Mr. Van Autreve is the beneficiary of the Thomas E. Van Autreve IRA.

251.    Michael S. Vaughan is an individual residing in Fort Worth, Texas.  Mr. Vaughan is the beneficiary of the Michael S. Vaughan IRA.

252.    Edward L. Vaughn is an individual residing in Richmond, Texas.  Mr. Vaughn is the beneficiary of the Edward L. Vaughn  IRA.

253.    Jose Antonio Vigorena is an individual residing in Mexico.

254.    Reginald and Maria Elena Villalovas are married individuals residing in Houston, Texas.

255.    Joan W. Villarubia is an individual residing in Metairie, Louisiana.

256.    Deborah Vollmer is a director for Ticker Tape Partners, Ltd, an entity organized under the laws of the state of Florida.  Ms. Vollmer resides in Sarasota, Florida.

257.    Hemant and Chuni Vyas are married individuals residing in Spring, Texas.

258.    Mack H. Walpole is an individual residing in Hockley, Texas.  Mr. Walpole is the beneficiary of the Mack H. Walpole IRA.

259.    James A. Hollabaugh Wanserski is an individual residing in Smyrna, Georgia.  Mr. Wanserski is the beneficiary of the James A. Hollabaugh Wanserski IRA.

260.    Ed JohnWeinlein is an individual residing in Hilton Head, South Carolina.  Mr. Weinlein is the beneficiary of the Ed Weinlein IRA.

261.    Elizabeth N. Whitaker is an individual residing in Atlanta, Georgia.

262.     Richard and Nancy White, individually and as trustees of the NRW Family Trust. Mr. and Mrs. White reside in Dallas, Texas.

263.     Anne Whittle is an individual residing in Ponte Vedra, Florida.  Ms.Whittle is the beneficiary of the Anne Whittle IRA.

264.     William Hampton Morris is the trustee of William Pippin III Insurance Trust.  Mr. Morris resides in Atlanta, Georgia.

265.     Judy Williams is the President of Thornton Tye Investments LP, a limited partnership organized under the laws of the state of Texas.

266.     Judy Williams is the President of Thornton Tye Medical LP, a limited partnership organized under the laws of the state of Texas.

267.     John M. Wilson, Jr., is an individual residing in Woodstock, Georgia.  Mr. Wilson is the beneficiary of the John M. Wilson, Jr. Ben. IRA.  Mr. Wilson is also the beneficiary of the John M. Wilson, Jr. IRA.

268.     Richard and Maxine Wilson are married individuals residing in Houston, Texas.

269.     Kenneth J. and Ginger Winningkoff are married individuals residing in The Woodlands, Texas.  Mrs. Winningkoff is the beneficiary of the Ginger Winningkoff IRA.  Mr. Winningkoff is the beneficiary of the Kenneth J. Winningkoff IRA.

270.     Kate Lane Withers is an individual residing in Kennesaw, Georgia.

271.     Moonyean Wood is an individual residing in Brevard, North Carolina.

272.     Douglas E. Young is an individual residing in New Braunfels, Texas.  Mr. Young is the beneficiary of the Douglas E. Young IRA.

273.     Vince and Brett Zagone are married individuals residing in Houston, Texas.

274.     Adriana Zaragoza is an individual residing in Cuidad, Juarez, Mexico.

275.    Gordon W. and Alice M. Zothner are married individuals residing in Richmond, Texas.  Mrs. Zothner is the beneficiary of the Alice M. Zothner IRA.  Mr. Zothner is the beneficiary of the Gordon W. Zothner IRA.